CITY OF ROCHESTER HILLS v SCHULTZ

Docket No. 110294. Argued January 20, 1999 (Calendar No. 8). Decided April 27, 1999.

Edna H. Schultz was ticketed by the city of Rochester Hills for displaying a sign on residential property advertising a home business in violation of Ordinance 200, § 4.02. She moved in the 52nd District Court for dismissal, arguing that the ordinance abridged her right to commercial speech under the First Amendment. The court, James P. Sheehy, J., granted defendant's motion, holding that the city has the power to regulate commercial signs, but does not have the right to ban them. The Court of Appeals, MARKEY, P.J., and BANDSTRA and HOEKSTRA, JJ., affirmed in an opinion per curiam, holding that the ban on home occupation signs did not directly advance the asserted governmental interest and was more extensive than necessary. 224 Mich App 323 (1997) (Docket No. 193500). The plaintiff appeals.

In a unanimous opinion by Justice CAVANAGH, the Supreme Court held:

Rochester Hills Ordinance 200, § 4.02 may be a legitimate restriction on the defendant's commercial speech rights under the First Amendment of the United States Constitution.

1. Commercial speech is protected by the First Amendment from unwarranted governmental regulation. However, First Amendment jurisprudence recognizes a distinction between commercial speech and political or expressive speech. Under *Central Hudson Gas & Electric Corp v Public Service Comm of New York*, 447 US 557 (1980), a four-part inquiry is to be undertaken to determine if a regulation is constitutional: Does the speech concern a lawful activity and is it not misleading; is the government's restriction justified by a substantial governmental interest; if so, does the regulation directly advance the asserted governmental interest; and is the regulation more extensive than necessary to serve the governmental interest?

2. In this case, there is no dispute that the speech at issue is both lawful and not misleading and that the government's interest in regulating commercial signs in a residential area is substantial. The ordinance in question is designed to preserve the character of

residential areas within the city, and attempts to advance this interest by prohibiting commercial signs that are at odds with the city's residential character. The ordinance is not concerned with the content of the message because it leaves open ample means for a home business to advertise its commercial message to customers. An ordinance does not have to be the least restrictive means to remedy an asserted governmental interest. The fact that there may be less restrictive means to accomplish the government's goals will not invalidate an ordinance as long as the ordinance still provides a reasonable fit. The city's ban on home occupation signs is a reasonable and narrowly tailored way to preserve the nature and character of residential neighborhoods.

Reversed and remanded.

*Beier, Howlett* (by *John D. Staran* and *Lawrence R. Ternan*) for the plaintiff-appellant.

American Civil Liberties Union Fund of Michigan (by *Elsa M. Shartsis, Robert A. Sedler,* and *Michael J. Steinberg*) for defendant-appellee.

CAVANAGH, J. This case calls on us to review the constitutionality of a municipal ordinance prohibiting the erection of a sign advertising a home business in a residential area. Both the trial court and the Court of Appeals found that the ordinance violated the defendant's constitutional right to free speech. We reverse.

## I. FACTS AND PROCEEDINGS

Defendant operates a home business in Rochester Hills, selling health and beauty products. Her property is zoned for single-family residential use. Rochester Hills Ordinance 200, § 4.02 allows the operation of a

home occupation[1] on property zoned for residential use, provided that such activity:

> 1. Does not create a nuisance to the surrounding neighborhood.
> 2. Does not become more than an incidental function of the use of the dwelling for residential purposes.
> 3. Does not draw truck traffic other than a delivery by a truck no more frequently than an average of once a week.
> 4. Does not employ paid assistants or employees other than those living at the premises.
> 5. Does not cause more than a nominal increase of traffic.
> 6. *Does not cause the erection or maintenance of any signs.*
> 7. Does not take place outside of the dwelling and/or accessory buildings, so as to be a nuisance or not be in keeping with the residential nature of the surrounding residential area. [Rochester Hills Ordinance 200, § 4.02(a) (emphasis added).]

Defendant violated the ordinance by attaching a large sign to a tree in her front yard. The sign advertised defendant's home business as follows:

> Nu Skin and Interior Design
> Opportunities Available
> Earn Extra $$$
> Call (810) 852-5812

In February 1995, the city of Rochester Hills issued defendant a ticket for the sign. She filed a motion in the trial court to dismiss the prosecution, arguing that the ordinance unconstitutionally abridged her right to

---

[1] "Home Occupation" is defined as "an occupation or profession customarily carried on by the occupant of a dwelling unit at the dwelling unit as a secondary use which is clearly subservient to the use of the dwelling for residential purposes." Rochester Hills Ordinance 200, § 2.00.

commercial speech under the First Amendment. The motion was supported by a four-page affidavit stating that the yard sign was an effective advertising tool and that alternative methods of communicating her message had proven ineffective and too expensive. Ultimately the trial judge granted defendant's motion, holding that the city has the power to regulate commercial signs, but it does not have the right to ban them.

On appeal, the Court of Appeals affirmed the judgment of the trial court. 224 Mich App 323; 568 NW2d 832 (1997). In particular, it held that the ban on home occupation signs did not directly advance the asserted governmental interest and was more extensive than necessary. We granted leave to appeal. 458 Mich 861 (1998).

## II. THE COMMERCIAL SPEECH DOCTRINE

The First Amendment of the United States Constitution, as applied to the states through the Fourteenth Amendment, provides that the government "shall make no law . . . abridging the freedom of speech." US Const, Am I.[2] The parties agree that the speech involved in this case is commercial in nature. Such speech is protected by the First Amendment from "unwarranted governmental regulation." *Central Hudson Gas & Electric Corp v Public Service Comm of*

---

[2] Similarly, Michigan's Constitution provides:

> Every person may freely speak, write, express and publish his views on all subjects, being responsible for the abuse of such right; and no law shall be enacted to restrain or abridge the liberty of speech or of the press. [Const 1963, art 1, § 5.]

*New York*, 447 US 557, 561; 100 S Ct 2343; 65 L Ed 2d 341 (1980). However, First Amendment jurisprudence recognizes a distinction between commercial speech and political or expressive speech. This distinction was explained by the United States Supreme Court in *Bd of Trustees of the State Univ of New York v Fox*, 492 US 469, 477; 109 S Ct 3028; 106 L Ed 2d 388 (1989), quoting *Ohralik v Ohio State Bar Ass'n*, 436 US 447, 456; 98 S Ct 1912; 56 L Ed 2d 444 (1978):

> "Our jurisprudence has emphasized that 'commercial speech [enjoys] a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values,' and is subject to 'modes of regulation that might be impermissible in the realm of noncommercial expression.' "

Because commercial speech is different in nature than political or expressive speech, the United States Supreme Court has developed a four-part inquiry to determine if a regulation is constitutional that "turns on the nature both of the expression and of the governmental interests served by its regulation." *Central Hudson*, 447 US 563. That inquiry requires us first to ask: (1) Does the speech concern a lawful activity and is it not misleading, so that it falls within the protections of the First Amendment, and (2) is the government's restriction justified by a substantial governmental interest? *Id.* at 566. If those two questions are answered "yes," then we must go on to ask: (3) Does the regulation directly advance the asserted governmental interest, and (4) is the regulation more exten-

sive than necessary to serve the governmental interest? *Id.*[3]

There is no dispute that the speech at issue is both lawful and not misleading. The parties also agree that the government's interest in regulating commercial signs in a residential area is substantial. In particular, the city implemented the restriction on home occupation signs in order to "protect[] and maintain[] the nature and character of residential neighborhoods in the City by permitting only minimal, incidental, non-disruptive commercial activity within residential zones." 224 Mich App 328. Therefore, our inquiry focuses on the last two questions of the *Central Hudson* inquiry: whether the prohibition on home occupation signs directly advances the asserted governmental interest, and whether the regulation is more extensive than necessary.

### A. DOES THE REGULATION DIRECTLY ADVANCE THE ASSERTED GOVERNMENTAL INTEREST?

The Court of Appeals held that the ban on home occupation signs did not directly advance the city's interest in protecting the character of residential neighborhoods. In particular, the Court stated that "[t]he banning of home occupation signs does nothing to stem the growth of home businesses; it just prevents homeowners from posting signs on their property touting their wares and services." 224 Mich App 328. It also believed that the regulation did not directly advance the city's interest in aesthetics because the city allowed a variety of other types of

---

[3] The city has the burden of establishing the validity of its regulation under the *Central Hudson* inquiry. *Cincinnati v Discovery Network, Inc,* 507 US 410, 416; 113 S Ct 1505; 123 L Ed 2d 99 (1993).

signs to be posted in residential areas that are no more or less aesthetically offensive than home occupation signs.

However, we believe that the analysis of the Court of Appeals undervalues the relationship between the city's goals and the home occupation sign ban. To begin, there is no doubt that signs or billboards on a person's property, "by their very nature, wherever located and however constructed, can be perceived as an 'esthetic harm.'" *Members of the City Council of Los Angeles v Taxpayers for Vincent*, 466 US 789, 808; 104 S Ct 2118; 80 L Ed 2d 772 (1984), quoting *Metromedia, Inc v San Diego*, 453 US 490, 510; 101 S Ct 2882; 69 L Ed 2d 800 (1981). Indeed, signs often present unique regulatory difficulties for local government.

> While signs are a form of expression protected by the Free Speech Clause, they pose distinctive problems that are subject to municipalities' police powers. Unlike oral speech, signs take up space and may obstruct views, distract motorists, displace alternative uses for land, and pose other problems that legitimately call for regulation. [*City of Ladue v Gilleo*, 512 US 43, 48; 114 S Ct 2038; 129 L Ed 2d 36 (1994).]

This is particularly true when the government is concerned not about the content of the message contained on the sign, but rather the appearance of the sign itself. *Metromedia*, 453 US 510.[4] In other words, "the substantive evil—visual blight—is not merely a possible byproduct of the activity, but is created by the medium of expression itself." *Vincent*, 466 US 810.

---

[4] We note that while *Metromedia* was a plurality opinion, a majority of the Court agreed with the lead opinion's analysis under the commercial speech doctrine. See 453 US 541 (Stevens, J., dissenting in part).

In this case, the city is not concerned with the content of the message on a home occupation sign; it is concerned about the visual characteristics of the sign. The ordinance in question is designed to preserve the character of residential areas within the city. It attempts to advance this interest by prohibiting commercial signs that are at odds with this residential character. Further, the ordinance is not concerned with the content of the message because it leaves open ample means for a home business to get across its commercial message to customers. For example, defendant could advertise through the local newspaper, phone book, mailings or fliers, or she could erect a sign in an area zoned for commercial use. The ordinance does not prevent defendant from expressing the substance of her commercial speech through any of these other mediums. It only prevents her from expressing her message in a specific and limited way.[5] See *Florida Bar v Went For It, Inc*, 515 US 618, 633-634; 115 S Ct 2371; 132 L Ed 2d 541 (1995) (a thirty-day prohibition against a certain form of legal solicitation was upheld because it left so many other channels of communication open to lawyers).

The Court of Appeals rejected this line of analysis because the city's regulatory scheme allowed several other types of "signs" in residential areas.[6] However, we are not persuaded by the Court of Appeals reason-

---

[5] In this regard, this case is distinguishable from the United States Supreme Court's recent plurality decision in *44 Liquormart, Inc v Rhode Island*, 517 US 484; 116 S Ct 1495; 134 L Ed 2d 711 (1996). The statutes in question in *44 Liquormart* prohibited advertising the price of alcoholic beverages in any medium and "in any manner whatsoever." *Id.* at 489. The plurality struck down the regulations, focusing on the fact that the laws constituted a blanket ban on certain commercial speech. In contrast, the ordinance in this case only prohibits one method of expressing commercial speech. It is not a blanket ban.

[6] The Court cited the following list of fourteen other types of signs allowed by the city:

ing. First, the city is not required to remove all signs from residential areas in order to further its goal of preserving the character of residential neighborhoods. As the United States Supreme Court has stated in the context of political or expressive speech: "[e]ven if some visual blight remains, a partial, content-neutral ban [on signs] may nevertheless enhance the City's appearance." *Vincent,* 466 US 811.

Second, we agree with the city that the types of signs that are allowed in residential areas are consistent with the character of residential neighborhoods. The permitted signs are of a different nature than home occupation signs because they are either noncommercial in nature, are protected as expressive or political speech, are informational in nature (such as street signs or subdivision signs), or are temporary signs (such as garage sale or real estate signs). Just because the city has concluded that the interest in noncommercial or temporary signs outweighs its municipal interest in preserving the character of residential neighborhoods does not mean that it must

---

Plaintiff allows, with restrictions, property owners to post in areas zoned for single-family residential use (1) premises signs at entrances of subdivisions, residential developments, and mobile home parks; (2) real estate development signs naming the property, developer, contractor and subcontractors, engineers, architects, brokers, and financial institutions of real estate developments; (3) real estate signs; (4) model home signs inviting the public to tour model homes; (5) signs containing street numbers, name of premises, name of owner, and name of occupant; (6) signs warning of danger, prohibition, or regulation of the use of property; (7) flags of any state or nation; (8) signs bearing any message posted inside windows; (9) labels identifying the brand name of property to be sold; (10) signs indicating the date of erection of buildings; (11) political signs; (12) garage sale signs; (13) signs of public authorities in pursuance of their public duties; and (14) outdoor church and institutional bulletin boards. [224 Mich App 329.]

also "give similar weight to all other commercial advertising." *Metromedia,* 453 US 512.[7]

In short, we believe that the ban on home occupation signs may directly advance the city's interest in preserving the character of its residential neighborhoods. Indeed, the United States Supreme Court has expressly recognized as much. See *Metromedia,* 453 US 511 (the banning of billboards "is directly related to the stated objectives of traffic safety and esthetics"), and *Vincent,* 466 US 810 (a ban on signs "responds precisely to the substantive problem which legitimately concerns the City"). Thus, the ordinance

---

[7] The city specifically distinguishes all the different types of signs listed by the Court of Appeals as follows:

"[P]remise signs" at entrances to subdivision developments and mobile home parks are not of the nature of commercial advertisements but rather, are entranceway signs which identify a particular subdivision or neighborhood, not markedly different in nature and purpose than street signs. "Real estate development signs" are temporary and informational in nature, and do not advertise products for sale or business opportunities. "Real estate signs" are also temporary in nature and are constitutionally protected under the authority of *Linmark Associates v Willingboro Twp,* 431 US 85 [97 S Ct 1614; 52 L Ed 2d 155 (1977)]. "Model home signs" are temporary in nature, as well as directional. "Signs containing street numbers," etc., are necessary for identification, directional, and safety reasons and are noncommercial. "Signs warning of danger," etc., are obviously allowed for public health, welfare and safety reasons and are noncommercial. "Flags" are political speech. "Signs bearing any message posted inside windows" are not allowed without limitation and furthermore do not raise the same issues that free standing and exterior signs do with respect to visual clutter, obstructing views, distracting motorists, and displacing other land uses. "Labels" identifying brand names do not pertain to residential signs, but rather, to retail stores. "Signs indicating the date of erection of buildings" is informational much like addresses and owner names. "Political signs" are noncommercial and are constitutionally protected under the authority of *Ladue, supra.* "Garage sale signs" are both traditional and very temporary in nature. "Signs of public authorities" are noncommercial and further the public health, safety and welfare. Lastly, "outdoor church" and institutional bulletin board signs are noncommercial and observe tradition and also freedom of religion.

is not necessarily unconstitutional under the third prong of the *Central Hudson* test.

While we agree with the city that the Court of Appeals erred in concluding that the ordinance in question is unconstitutional under the third prong of the *Central Hudson* test, this holding does not alleviate the city's burden of establishing the validity of its regulation. *Cincinnati v Discovery Network, Inc*, 507 US 410, 416; 113 S Ct 1505; 123 L Ed 2d 99 (1993). In particular, a commercial speech regulation " 'may not be sustained if it provides only ineffective or remote support for the government's purpose.' " *44 Liquormart, Inc v Rhode Island*, 517 US 484, 505; 116 S Ct 1495; 134 L Ed 2d 711 (1996). In this case, the complaint against defendant was dismissed before the city had the opportunity to produce testimony or evidence establishing the link between the home occupation sign ban and preserving the residential character of its neighborhoods. Therefore, we believe it is appropriate to remand this case to the trial court so that the city may have the opportunity to establish the proper factual link between the purpose and the effect of the ordinance.

### B. IS THE REGULATION MORE EXTENSIVE THAN NECESSARY TO SERVE THE GOVERNMENTAL INTEREST?

Despite its conclusion that the ordinance in question did not meet the third prong of the *Central Hudson* test, the Court of Appeals also determined that there was not a reasonable fit between the ordinance and the goal of preserving the residential character of neighborhoods because "the hazards plaintiff seeks to prevent can be easily remedied by restrictions short of a total ban on home occupation signs." 224 Mich App 331-332. Once again, we are unpersuaded by the Court of Appeals analysis.

The last prong of the *Central Hudson* inquiry requires us to analyze the "fit" between the ban on home occupation signs in this case and the city's interest in preserving the character of its residential neighborhoods. The United States Supreme Court explained the requirements of this fourth prong as follows:

> What our decisions require is a " 'fit' between the legislature's ends and the means chosen to accomplish those ends,"—a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is "in proportion to the interest served," that employs not necessarily the least restrictive means but, as we have put it in the other contexts discussed above, a means narrowly tailored to achieve the desired objective. Within those bounds we leave it to governmental decisionmakers to judge what manner of regulation may best be employed. [*Fox*, 492 US 480 (citations omitted).]

Thus, the ordinance does not have to be the "least restrictive means" to remedy the asserted governmental interest. The fact that there may be less restrictive means to accomplish the government's goals will not invalidate an ordinance as long as the ordinance still provides the required "reasonable fit." The question is whether the city's ban on home occupation signs is a reasonable and narrowly tailored way to preserve the nature and character of residential neighborhoods. Again, we draw guidance from the United States Supreme Court's decisions in *Metromedia* and *Vincent*.

In *Metromedia*, the Court concluded that a ban on billboards was narrowly tailored to meet the twin goals of traffic safety and aesthetics. It explained:

> If the city has a sufficient basis for believing that billboards are traffic hazards and are unattractive, then obvi-

ously the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them. The city has gone no further than necessary in seeking to meet its ends. Indeed, it has stopped short of fully accomplishing its ends: It has not prohibited all billboards, but allows onsite advertising and some other specifically exempted signs. [*Metromedia*, 453 US 508.]

In *Vincent*, the Court concluded the same was true for signs posted on public property. Since *Vincent* involved noncommercial speech on public property, the Court analyzed the ordinance at issue under the "strict scrutiny" standard. Following the lead of the Court in *Metromedia*, it upheld the ban on signs on public property:

As recognized in *Metromedia*, if the city has a sufficient basis for believing that billboards are traffic hazards and are unattractive, "then obviously the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them." 453 US at 508. As is true of billboards, the esthetic interests that are implicated by temporary signs are presumptively at work in all parts of the city, including those where appellees posted their signs, and there is no basis in the record in this case upon which to rebut that presumption. These interests are both psychological and economic. The character of the environment affects the quality of life and the value of property in both residential and commercial areas. We hold that on this record these interests are sufficiently substantial to justify this content-neutral, impartially administered prohibition against the posting of appellees' temporary signs on public property and that such an application of the ordinance does not create an unacceptable threat to the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co v Sullivan*, 376 US 254, 270 [84 S Ct 710; 11 L Ed 2d 686] (1964). [*Vincent*, 466 US 817.]

We agree with the United States Supreme Court that, in the present case, one of the most effective

ways for the city to protect the character of residential areas may be to prohibit home occupation signs altogether. Stopping short of prohibiting home occupation signs might still allow the blurring of the line between residential and commercial districts, and would not advance the city's interest as fully as a ban. As noted above, the city still must prove the direct link between the ordinance and the harm sought to be prevented on remand. However, we disagree with the Court of Appeals that the possibility of adopting restrictions short of a ban necessarily makes the ordinance unconstitutional.

### III. CONCLUSION

We hold that the Court of Appeals erred in concluding that Rochester Hills Ordinance 200, § 4.02  is unconstitutional under the four-part *Central Hudson* analysis. The ordinance may be a legitimate restriction on defendant's commercial speech rights under the First Amendment  of the United States Constitution. Therefore, we reverse the judgment of the Court of Appeals, and we remand the case to the trial court so that it may proceed in a manner consistent with this opinion.

WEAVER, C.J., and BRICKLEY, KELLY, TAYLOR, CORRIGAN, and YOUNG, JJ., concurred with CAVANAGH, J.